# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|   |   |   |
|---|---|---|
| JOZY J. MERIT, | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | **NO.    02-8629** |
| SOUTHEASTERN PENNSYLVANIA | : | |
| TRANSIT AUTHORITY, | : | |
| **Defendant** | : | |
| | : | |

## MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                                              **April 30, 2004**

<u>Pro</u> <u>se</u> Plaintiff Jozy J. Merit alleges that her former employer, Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA"),[1] discriminated and retaliated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112, 12203, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 <u>et seq.</u> Presently before the Court is SEPTA's Motion for Summary Judgment. For the reasons below, SEPTA's Motion is granted.

## I.      BACKGROUND

SEPTA hired Plaintiff as a Vehicle Equipment General Helper on November 25, 1991. In June 1992, Plaintiff was laid off, but on April 12, 1993, SEPTA rehired her as a Vehicle and Equipment Mechanic, 3rd Class. On April 24, 1994, Plaintiff injured her back while cleaning the inside of a bus. After her injury Plaintiff filed two complaints with SEPTA's Equal Employment

---

[1] Plaintiff's Complaint misidentifies Defendant as "Southeastern Pennsylvania **Transit** Authority," but Defendant is properly known as "Southeastern Pennsylvania **Transportation** Authority." Defendant apparently does not object, and the Court clarifies the error only to avoid any confusion.

Opportunity/Affirmative Action ("EEO/AA") office claiming SEPTA discriminated against her and harassed her on the basis of her gender while working at SEPTA's Callowhill Depot. The ultimate disposition of these complaints is unclear from the record.

Plaintiff collected workers' compensation benefits from April 1994 until October 1999. On October 4, 1999, pursuant to its Alternative Duty Program,[2] SEPTA offered and Plaintiff accepted a light-duty position working as a cashier on the "Market Frankford El" train line.

In addition to her back injury, Plaintiff suffers from asthma and migraine headaches. The cashier position required that Plaintiff work in an enclosed, unventilated cashier booth. Contrary to SEPTA rules, some employees smoked cigarettes in the cashier booth, and for reasons not apparent on the record, SEPTA was unable to prevent this recalcitrant conduct. The secondhand smoke aggravated Plaintiff's asthma, causing her to become nauseous and to cough violently, and sometimes triggered migraine headaches. When Plaintiff attempted to open the door to the booth or step outside to get fresh air, her supervisor told her to stop or she would be fired. On May 18, 2000, Plaintiff grieved these conditions in a complaint filed with SEPTA's EEO/AA office. She subsequently withdrew the complaint.

On June 20, 2000, Plaintiff submitted a medical note from her doctor to SEPTA's Medical Department stating that Plaintiff was unable to work under these conditions because cigarette smoke and chemical odors triggered her asthma and migraines. In response, SEPTA medically disqualified Plaintiff from working as a cashier. On June 21, 2000, SEPTA offered and

---

[2] As part of its collective bargaining agreement with the Transport Workers Union of Philadelphia, Local 234 ("TWU"), SEPTA had developed an Alternative Duty Program. Under that program, SEPTA employees who become medically disqualified from performing their regular duties can be reassigned to a light duty position. On August 17, 1999, based on a recommendation from Plaintiff's treating physician, Dr. Marvin Schatz, SEPTA medically disqualified Plaintiff from her position as a mechanic.

Plaintiff accepted another light-duty position working as a Vehicle Readiness Coordinator ("VRC") in the Bus Operations Division.

In July 2000, Plaintiff began working as a VRC at SEPTA's Comly District Maintenance Shop. Plaintiff accepted the VRC position in part because it was close to her home and was "double-shifted," meaning Plaintiff worked alongside another SEPTA employee who shared her duties and could assist Plaintiff if she had a problem related to her physical limitations. The VRC position also required Plaintiff to work in an enclosed booth, known as a "blockers booth," but unlike the cashier booth, the blockers booth was above ground and had some ventilation.

Despite instructions to the contrary from SEPTA's Director of Maintenance at Comly, William Cook, SEPTA employees smoked cigarettes in the Comly blockers booth, which aggravated Plaintiff's asthma and migraine headaches. At some point, one employee ("Phil") posted on the wall of the blockers booth a note stating:

> Just as you have a right to file a complaint so do I about how you do not clean the booth, do not turn in all your paper work and destroy SEPTA property by writing on the windows and wall. You expect us to stand out in the cold to smoke, just like you tried on Market Street. We heard about your little notes. I plan to smoke but not in the cold while you are not here and if it stinks bring air freshners with you. We all have rights also. Do your job right first before threatening someone. Only a few more weeks until the picking so you can pick elsewhere. Phil.

(errors in original).

In September and October 2000, Plaintiff requested certain job modifications to accommodate her back injury. First, Plaintiff began using a reaching/grabbing device while performing her duties. Other VRCs stood inside the blockers booth and reached up to passing buses to collect "trouble cards" from bus drivers. Raising her arms over shoulder height aggravated Plaintiff's back injury, so she fashioned and utilized a reaching device (consisting of a clothespin

affixed to a stick) to retrieve the cards. Mr. Cook instructed her not to use the reaching device. If she was unable to reach up, he told her, she should come out of the blockers booth as a bus enters the facility and walk around the bus to collect the card from the bus driver. Failure to comply with these directives, Mr. Cook said, would result in her termination. A TWU representative also instructed Plaintiff not to use the reaching device.

Plaintiff complained that coming out of the blockers booth to collect the form would require that she frequently go up and down the steps leading to the booth, which also aggravated her back injury. Accordingly, Plaintiff requested that a chair be placed outside the blockers booth for her use. (This request also may have been an effort to avoid cigarette smoke in the blockers booth.) Plaintiff's supervisor, Sandy Johnson, and Mr. Cook both denied this request. When Plaintiff sat on the ground outside the blockers booth, Mr. Cook and Ms. Johnson told her she was not allowed to sit outside the booth and would be fired if she persisted.

Finally, Plaintiff requested that she be excused from SEPTA's requirement that VRCs wear steel-tipped boots, whose added weight aggravated her back injury. On at least one occasion Plaintiff's supervisor cited her for wearing improper footwear (sandals). Plaintiff contends that no other SEPTA employees were required to wear steel-tipped boots, and that SEPTA singled her out in order to harass her.

Plaintiff claims that SEPTA denied her requests for these "reasonable accommodations," and that SEPTA retaliated against her by changing the work schedule so that Plaintiff was no longer double-shifted. Believing that she was the subject of harassment and retaliation, Plaintiff requested that SEPTA transfer her to another position, but no positions were available. In September or October 2000, Plaintiff spoke with Ms. Melica Blige in SEPTA's

EEO/AA office and complained about harassment, intimidation and retaliatory changes to her work duties, and asked for accommodations for her physical limitations. After complaining to other SEPTA offices as well, Plaintiff learned that she could submit her work modification requests, along with a note from her doctor, at SEPTA's monthly meetings concerning job modifications. Plaintiff also complained to Ms. Johnson and Mr. Cook that she was subject to discrimination and retaliation as a result of her complaints and requests for accommodation, but it is not clear when she spoke with them.

On October 13, 2000, Plaintiff saw Dr. Barry Schnall to discuss her physical limitations and their impact on her ability to perform her duties as a VRC. Dr. Schnall concluded that he could not justify taking her out of her position based on its physical demands. However, he opined that Plaintiff could better perform her duties with some reasonable changes in the conditions of Plaintiff's job, including use of the reaching device, a chair outside the blockers booth, and an exemption from wearing steel-tip boots. Dr. Schnall also provided Plaintiff with a note expressing his view that SEPTA should permit these accommodations. By this time, however, it was too late to submit Dr. Schnall's note for the October meeting. Plaintiff was never informed of the November meeting date, and in any event SEPTA fired her before she could have submitted the request.[3]

On October 25, 2000, in response to an internal SEPTA posting, Plaintiff applied for a position as a maintenance manager. Plaintiff was told she would be interviewed within the next five weeks.

On November 6, 2000, Plaintiff was working in the blockers booth alongside her foreperson, Ms. Johnson. Plaintiff alleges that Ms. Johnson, in retaliation for Plaintiff's repeated

---

[3] Pl.'s Resp. at 12; Merit Dep. at 114-116. There appears to be no evidence in the record regarding the dates of these monthly meetings.

requests for accommodations, started smoking cigarettes in the booth with the door and windows closed. Plaintiff began to experience a migraine headache, the left side of her face became numb, and she became concerned that an asthma attack might ensue. Plaintiff requested an injured-on-duty ("IOD") report from Ms. Johnson and Michael E. Himes, another SEPTA maintenance foreperson, explaining that she had swollen blood vessels in her head. Plaintiff stated that she expected to be out of work for two to three weeks. Mr. Himes told Plaintiff she was describing a sickness, not an injury. Plaintiff received the IOD form but Mr. Himes and Ms. Johnson refused to sign it. Plaintiff took an Imitrex pill, one of her prescribed medications for alleviating migraine headaches, and asked Mr. Himes to call for medical assistance. Emergency personnel transported Plaintiff to the hospital, but she received no medical treatment.

The next day, November 7, 2000, Plaintiff called out sick from work. Cowanis Duckett, Mr. Cook's successor as SEPTA's Director of Maintenance, directed Plaintiff via letter to report to SEPTA's Medical Department on November 13, 2000 for a physical examination. Mr. Duckett instructed Plaintiff to bring with her a report from her doctor outlining the nature of her illness and the length of time it was anticipated she would be out of work. Plaintiff met with Dr. Richard Press, SEPTA's Medical Director, as scheduled but failed to bring any documentation from her own doctor. Dr. Press cleared Plaintiff to return to work.

On November 18, 2000, Paul [last name illegible], Plaintiff's supervisor, reported Plaintiff for causing "service interruptions." Based on Paul's account, Plaintiff submitted an IOD form claiming she was injured by chemicals in cigarette smoke. Plaintiff apparently remained at work because a half-hour later she told Paul there would be delays in servicing the buses due to inadequate "prep time." She further explained that several bus engines would not start, but upon

Paul's inquiry could not identify the inoperative buses. When questioned about other available buses, Plaintiff stated that those buses lacked working radios. Paul directed the drivers to use the buses anyway, but then Plaintiff told the drivers not to use the buses. Plaintiff also told Paul that another bus was blocked by a parked car. Upon investigation, Paul found that no buses were blocked by a parked car. A "street supervisor" eventually intervened and assisted Paul in getting the buses out of the depot on schedule. Paul concluded that "this all happened intentionally because of spite by J. Merit for the Authority and her fellow employees."[4] This incident gave rise to Plaintiff's sixth disciplinary citation in less than four months.

On November 19, 2000, Mr. Duckett informed Plaintiff and another VRC working at Comly, Madelaine Caldwell, that they would be transferred temporarily to work at SEPTA's Frontier District on November 24, 2000. Plaintiff was not familiar with the Frontier District location, but after traveling there the next day, Plaintiff told Mr. Duckett that the commute was too long given her physical limitations. Specifically, she complained that commuting to the Frontier District added six to eight hours to her workday, and that the frequent stops and starts (i.e., "jerking") during the long ride would aggravate her back injury. She also told Mr. Duckett that she believed SEPTA was transferring her in retaliation for seeking disability accommodations. Plaintiff requested that she be permitted to work at a location closer to her home. In response, Mr. Duckett instructed Plaintiff to report to SEPTA's Medical Department for another evaluation.

Dr. Press re-evaluated Plaintiff on November 22, 2000. Plaintiff did not bring any medical documentation or a note from her doctor regarding her ability to travel to the Frontier District. She told Dr. Press that the commute to the Frontier District was too long and asked him

---

[4] Special Supervisor's Report of 11/18/00 (bates-stamped SEP0219-SEP0221).

to approve a location accommodation. Dr. Press refused, saying she should take the issue up with management and that "work location assignments are not a Medical Dept matter."[5] Dr. Press cleared Plaintiff to work as a VRC at the Frontier District and reminded her that refusing to report for duty is a dischargeable offense.

Immediately thereafter Plaintiff was directed to meet with John Jamison, SEPTA's labor relations manager. Even though she complained that the lengthy commute would aggravate her physical conditions, Mr. Jamison told Plaintiff that she must report to the Frontier District on November 24, 2000, and that the transfer could last for a few days or a few months. If she was not feeling well, Mr. Jamison told her, "you can always call out sick, but you have to go to Frontier."[6] Mr. Jamison then called William Bethel, SEPTA's Director of Maintenance at the Frontier District, and told him that Plaintiff would likely attempt to call out sick rather than report to work on November 24, 2000. He suggested that in those circumstances Mr. Bethel should give Plaintiff a "direct order" to report to SEPTA's Medical Department.[7]

Just as Mr. Jamison predicted, Plaintiff did not report to the Frontier District on November 24, 2000. Instead, she called the maintenance manager at Frontier, Larry Marsaglia, and asked him to enter her name in the "sick book." Pursuant to previous instructions from Mr. Bethel, Mr. Marsaglia refused to enter Plaintiff's name in the sick book and instead gave her a direct order to report to SEPTA's Medical Department. Plaintiff told Mr. Marsaglia that she was too sick to

---

[5] Med. Dep't Med. Notes of 11/22/00.

[6] Merit Dep. at 173:12-13.

[7] Memorandum from Bethel to Curley of 1/17/01.

travel to the Medical Department.[8]

Plaintiff then contacted a foreman working at Comly and asked him to enter her name in the sick book. He agreed to do so, although he reminded Plaintiff that she was no longer assigned to Comly. In addition, Plaintiff contacted a TWU representative and asked that TWU file a grievance on her behalf regarding Mr. Marsaglia's refusal to enter Plaintiff's name in the sick book. Finally, Plaintiff contacted SEPTA's EEO/AA office and Linda Yoxtheimer, SEPTA's Assistant Director of Vocational Rehabilitation, to complain that the transfer to Frontier was retaliatory. Ms. Blige of the EEO/AA office asked Plaintiff to report to the EEO/AA office to discuss the complaint, but Plaintiff said she was too sick.

By November 27, 2000, Plaintiff had not reported to either the Frontier District or SEPTA's Medical Department. Accordingly, SEPTA terminated Plaintiff's employment for "failure to follow a direct order, AWOL, and abandonment of your job."[9] Obviously, as a result of her termination, Plaintiff did not receive a promotion to the position of SEPTA maintenance manager.

After leaving SEPTA, Plaintiff worked as a sales representative at a department store and at three different automobile dealerships, but she continued to press her claims against SEPTA in various fora. On January 22, 2001, Plaintiff filed a complaint with SEPTA's EEO/AA office claiming disability discrimination and retaliation. Although there is no documentation outlining the disposition of this complaint, it was apparently unsuccessful. Plaintiff's union also grieved her termination. After a May 29, 2001 hearing, a panel of arbitrators denied the union grievance and upheld Plaintiff's termination.

---

[8] Memorandum from Marsaglia to Bethel of 11/24/00.

[9] Letter from Bethel to Merit of 11/27/00.

Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") (dual-filed with the Pennsylvania Human Relations Commission) on October 16, 2001 and received her right to sue letter on October 1, 2002. The instant action followed in this Court, and on March 21, 2003 SEPTA filed a motion to dismiss. When Plaintiff failed to file a timely response, the Court issued an order to show cause why the motion should not be granted as uncontested. Plaintiff responded with a lengthy filing that, among other things, requested the assistance of court-appointed counsel. Accordingly, the Court referred this matter to the Plaintiff's Employment Panel for the Eastern District of Pennsylvania for possible appointment of counsel. When no attorney volunteered to represent Plaintiff, the Court addressed SEPTA's motion to dismiss, granting the motion as to Plaintiff's wrongful discharge claim but denying the motion as to Plaintiff's ADA and PHRA claims.[10]

After holding a Rule 16 conference on the record, the Court set a discovery deadline of December 23, 2003. SEPTA filed a timely motion for summary judgment on January 23, 2004. Plaintiff responded on February 9, 2004 with a voluminous (and sometimes enigmatic) filing that, among things, claimed SEPTA had failed to produce relevant discovery. There was no accompanying motion to compel or affidavit explaining the need for additional discovery under Federal Rule of Civil Procedure 56(f).

Over two months later, on April 20, 2004, Plaintiff filed a motion to extend the May 2004 pretrial filing deadlines and to compel additional discovery. Plaintiff argues therein that SEPTA's responses to her interrogatories were inadequate, but the Court's review of those responses

---

[10] See Merit v. Southeastern Pa. Transit Auth., 276 F. Supp. 2d 382 (E.D. Pa. 2003). The Court also excused Plaintiff's untimely filing before the EEOC in light of Plaintiff's pro se status and her claim that medical issues had inhibited her ability to represent herself.

reveals that SEPTA provided timely and adequate answers, subject only to limited, reasonable objections. Plaintiff seeks to excuse this late filing by contending that sickness and work prevented her from "having the physical energy and endurance, to physically, and more aggressively pursue this discovery request sooner." [sic] However, the Court notes that during the same period these obstacles did not prevent Plaintiff from filing two typewritten memoranda of law exceeding 130 pages excluding exhibits. Thus, Plaintiff should have, and apparently could have, addressed her discovery needs in a more timely fashion. Moreover, the additional discovery sought, which pertains primarily to SEPTA employee names and records, would not fill the dispositive evidentiary gaps in Plaintiff's evidence. Accordingly, Plaintiff's motion is denied, and SEPTA's Motion for Summary Judgment is ripe for disposition.[11] The familiar summary judgment standard of review governs.[12]

## II.    PLAINTIFF'S INTENTIONAL DISCRIMINATION CLAIMS[13]

The ADA prohibits discrimination by covered entities against qualified individuals with a disability because of that disability.[14] There is no dispute that SEPTA is a covered entity, but SEPTA contends that Plaintiff is not within the ADA protected class of individuals with a disability.

---

[11] Although Plaintiff's memoranda are not paragons of lucidity, it bears mentioning that SEPTA's memoranda are uniquely unhelpful with respect to presenting an accurate chronological narrative, incorporating a *detailed* discussion of those facts into a persuasive legal argument, and citing all relevant, binding authority. As a consequence, the Court is put to the time-consuming tasks of mining the record and undertaking an exhaustive canvas of case law to gain a full understanding of the issues - - chores the Court would hope could be entrusted to litigants such as SEPTA who are represented by reputable counsel.

[12] See Davenport v. Medtronic, Inc., 302 F. Supp. 2d 419, 428-29 (E.D. Pa. 2004) (outlining Federal Rule of Civil Procedure 56(c) summary judgment standard of review).

[13] The Court's analysis of Plaintiff's ADA discrimination claims applies equally to her PHRA claims. See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002); Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

[14] 42 U.S.C. § 12112(a).

To successfully advance an ADA discrimination claim, Plaintiff must show that she: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.[15] Plaintiff contends she can satisfy any of these three definitions. For the reasons below, the Court disagrees.

A.    **Plaintiff Cannot Prove She Has a Physical Impairment That Substantially Limits One or More Major Life Activities**

Under Third Circuit precedent and EEOC regulations, determining whether an individual is substantially limited in one or more major life activities requires a two-step analysis. First, the Court must determine whether the plaintiff is substantially limited in any major life activity other than working. If the Court finds that the plaintiff is so limited, the inquiry ends. However, if the plaintiff is not so limited, the next step is to determine whether the individual is substantially limited in the major life activity of working.[16]

When determining whether a plaintiff asserting ADA claims is affected by a disability that substantially limits a major life activity, a court should consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact resulting from the impairment. Courts must adjudicate ADA claims on a case-by-case basis. "[O]nly extremely limiting disabilities - - in either the short or long-term - - . . . qualify for protected status under the ADA."[17]

Plaintiff avers that she suffers from asthma, migraine headaches and a back injury.

_____

[15] Id. § 12102(2).

[16] Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783-784 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, App. § 1630.2(j)).

[17] Marinelli v. City of Erie, Pa., 216 F.3d 354, 362 (3d Cir. 2000).

Although Plaintiff's memoranda are sometimes difficult to follow, she appears to claim that her impairments substantially limit her ability to breathe (due to asthma) and work (due to asthma, migraines and back pain), both of which are recognized major life activities under EEOC regulations.[18]

Turning first to Plaintiff's claimed limitation in the major life activity of breathing, Plaintiff testified that cigarette smoke in the SEPTA workplace triggered her asthma and substantially impaired her ability to breathe. Medical evidence from her health care providers supports this claim, and SEPTA acknowledged as much when it medically disqualified Plaintiff from working in the cashier booth due to the impact of cigarette smoke.[19]

In fact, all evidence of record suggests that SEPTA's smoke-filled workplace was the *only* cause of any substantial impairment of Plaintiff's ability to breathe. Plaintiff testified that she can avoid asthma attacks by avoiding cigarette smoke, and that as long as she does so she is "fine."[20] She was unequivocal that working in a closed, smoky booth was the source of her breathing problems, and that when she was no longer working in that environment, her extreme breathing difficulties dissipated.[21] It is clear from the record that any impairment of Plaintiff's breathing was

---

[18] Examples of "major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

[19] See, e.g., Merit Dep. Ex. 2, Note of 6/18/00 from Dr. Marvin Schatz ("Jozy Merit is unable to work in a closed booth. Cigarette smoke, chemical odors trigger asthma & migraines."); SEPTA Med. Dep't Med. Notes of 6/20/00 (bates-stamped SEP0103).

[20] Merit Dep. at 81:6-7; id. at 100:20-21 ("I'm controlling my asthma flare up because I'm avoiding cigarette smoke . . . .").

[21] See, e.g., Merit Dep. 104:13-17 ("I'm not having asthma attacks right now. I had them when I was working at SEPTA because they kept me locked in a booth smoking. At that time I was totally disabled because I was coughing and in spasm . . . ."); id. at 103:13-20 ("Q: So there have been times, for instance, where you've gotten up in the morning and you've been unable to dress yourself or take a shower because of an asthma attack? A: I'm referring to the times when I was at SEPTA, because that's the asthma that's the disability was [sic] at those

triggered by and flows directly from the presence of smoke in the SEPTA workplace and not from any other independent factor. In these circumstances, Plaintiff's claimed impairment in the major life activity of breathing is subsumed by her claim of impairment in the major life activity of working and should be analyzed as such.[22] Accordingly, the Court will now turn to whether Plaintiff can establish that she is substantially impaired in the major life activity of working.

Plaintiff contends that the combined effects of her asthma, migraine headaches and back injury substantially limit her ability to work. An individual is substantially limited in working if the individual is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."[23] Under this standard, "one must be precluded from more than one type of job, a specialized job, or a particular job choice."[24] Therefore, medical disqualification from working as a mechanic or in the Market Frankford El cashier booth does not establish that Plaintiff is substantially limited in the major life activity of working.

SEPTA argues that Plaintiff is not substantially limited in working because she testified that her back injury does not prevent her from performing a job that allows her to sit most

---

times triggered by cigarette smoke.").

[22] Rhoads v. Fed. Deposit Ins. Corp., 257 F.3d 373, 389 (4th Cir. 2001) ("[W]here an ADA plaintiff asserts that she disabled based on a substantial limitation of a major life activity other than working, but her condition is aggravated solely by her workplace environment, her claim must be assessed under [the test] for a limitation on working.").

[23] 29 C.F.R. § 1630.2(j)(3)(i).

[24] Sutton v. United Air Lines, Inc., 527 U.S. 471, 491-92 (1999); Tice v. Centre Area Transp. Auth., 247 F.3d 506, 512 (3d Cir. 2001).

of the time or work in a smoke-free environment.[25]  This argument is insufficient on its face.

SEPTA's argument would preclude a finding of disability if an individual is capable of performing

other work, either with accommodation or in a different class of jobs.  This is clearly not the law,[26]

and the cases cited by SEPTA do not stand for this proposition.  In <u>Tice</u>, 247 F.3d at 513, the Third

Circuit concluded that the plaintiff was not precluded from a broad range of jobs not merely because

he found other work, but because "he has not offered any evidence to suggest that his back injuries

have caused him any difficulties beyond their interference with his bus driving."  Similarly, in <u>Little</u>

<u>v. Southeastern Pennsylvania Transportation Authority</u>, No. Civ.A.01-4986, 2003 WL 1793528, at

*2 (E.D. Pa. Apr. 3, 2003), the court noted the plaintiff's ability to find other positions, but also

noted that the plaintiff "offers no evidence of limitation on her ability to work 'a broad class of jobs'

due to a physical or mental impairment."  In other words, in these cases it was the plaintiff's failure

to present affirmative evidence of preclusion from a broad range or class of jobs, not their ability

to find other jobs, that was outcome determinative.  After all, a disabled individual's ability to work

in some capacity is the whole point of the ADA.[27]

---

[25] <u>See</u> Merit Dep. at 59:14-16 ("[T]he main reason I can do this job [selling cars] is because I can sit.  I can just sit non-stop if I want and just make calls on the phone."); <u>id.</u> at 82:20-83:2 ("Q: Now, does your asthma prevent you from working?  A: If I'm around cigarette smoke, yeah, it restricts it.  Now, car sales they don't smoke inside . . . . Q: So your asthma limits you from working in an area where you're exposed to cigarette smoke?  A: Yes.").

[26] <u>See, e.g.</u>, <u>Mondzelewski</u>, 162 F.3d at 786 (rejecting argument that plaintiff is not substantially limited in working merely because he was able to perform his job with accommodation); 29 C.F.R. Part 1630, App. § 1630.2(j) ("[A]n individual does not have to be totally unable to work in order to be considered substantially limited in the major life activity of working.").

[27] Here, if there were adequate evidentiary support for Plaintiff's contention that due to her back injury she is significantly restricted in working, it would not matter that she is simultaneously able to perform sedentary work in a smoke-free workplace.  In those circumstances, she would be "significantly restricted in the ability to perform . . . a class of jobs," <u>i.e.</u>, that class of jobs requiring heavy lifting.  <u>See</u> 29 C.F.R. Part 1630, App. § 1630.2(j) ("[A]n individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs.").  While SEPTA's argument misses this critical point, Plaintiff's corresponding failure to marshal adequate evidentiary support is fatal to her claim.  It is not enough merely for Plaintiff to submit

At all events, Plaintiff's evidence contains the same flaw identified in both <u>Tice</u> and <u>Little</u>. To show a significant restriction in her ability to perform a class of jobs or a broad range of jobs, Plaintiff must present some affirmative evidence of, <u>inter alia</u>, her own work-related abilities and qualifications, the jobs available in her geographic area, the number of jobs utilizing her particular abilities and the number of those jobs from which she is disqualified due to her impairments (<u>i.e.</u>, she is restricted from a class of jobs), or the number of jobs that do not utilize her particular abilities and the number of those jobs from which she is disqualified due to her impairments (<u>i.e.</u>, she is restricted from a broad range of jobs in various classes).[28] Without such evidence, no reasonable jury could conclude that she is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes, or that her limitations, compared to the average person, constitute "a significant barrier to employment."[29] This is "not intended to require an onerous evidentiary showing," but it nonetheless requires at minimum a "presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., 'few,' 'many,' 'most') from which [Plaintiff] would be excluded because of an impairment."[30] There is simply no such evidence before

---

evidence that she cannot lift more than ten pounds. <u>See</u> Work Statement of 5/20/98, signed by Dr. Barry Schnall (opining that Plaintiff cannot lift more than 10-20 pounds). She must also submit evidence that this limitation restricts her from working in a class of jobs or a broad range of jobs. <u>See, e.g.</u>, <u>Marinelli</u>, 216 F.3d at 364 (evidence of plaintiff's physical limitations, without evidence of class of jobs from which plaintiff is disqualified as a result of his limitations, is insufficient to establish significant restriction in working). On this score, Plaintiff falls short.

[28] <u>See</u> 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C).

[29] <u>Mondzelewski</u>, 162 F.3d at 784.

[30] 29 C.F.R. pt. 1630, App. § 1630.2(j); <u>see also</u> <u>Ryan v. St. Mary of Providence</u>, No. 00 C 2453, 2001 WL 1143249, at *4, 2001 U.S. Dist. LEXIS 22783, at *13 (N.D. Ill. Sept. 28, 2001) ("Because 'this is not one of the rare cases in which the [plaintiff's] impairments are so severe that [her] substantial foreclosure from the job market is obvious,' at a minimum she was required to come up with some evidence of the types of jobs in her area from which she would have been excluded.") (quoting <u>EEOC v. Rockwell Int'l Corp.</u>, 243 F.3d 1012, 1017 (7th Cir. 2001)).

the Court, and its absence is fatal to Plaintiff's claim that she is substantially limited in the major life activity of working.[31]

## B.      Plaintiff Cannot Prove She Has a Record of Disability

A record of disability means an individual "has a history of, or has been misclassified as having," a substantially limiting impairment.[32]  "A plaintiff attempting to prove the existence of a 'record' of disability still must demonstrate that the recorded impairment is a 'disability' within the meaning of the ADA."[33]  Thus, like proof of a disability itself, a record of disability demands evidence of a substantial limitation in the performance of a major life activity.  A mere diagnosis of a particular impairment is not enough.  As explained <u>supra</u>, Plaintiff has failed to present evidence that her back injury, migraine headaches and/or asthma substantially limit her in any major life activity.  Accordingly, Plaintiff cannot establish that she has a record of disability under the ADA.[34]

---

[31] <u>Compare</u> <u>Mondzelewski</u>, 162 F.3d at 785-86 (finding vocational expert's report was sufficient to show the plaintiff was significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes), <u>with</u> <u>Cade v. Consol. Rail Corp.</u>, No. Civ.A.98-5941, 2002 WL 922150, at *11-12 (E.D. Pa. May 7, 2002) (holding plaintiff not substantially limited in working because plaintiff failed to present evidence of disqualification because of knee condition from any jobs in the geographic area to which she had reasonable access); <u>Balls v. AT & T Corp.</u>, 28 F. Supp. 2d 970, 975 (E.D. Pa. 1998) (granting summary judgment because the plaintiff failed to present demographic evidence to show from what jobs in her geographic area she had been excluded due to her impairment), <u>aff'd</u>, 229 F.3d 1137 (3d Cir. 2000) (Table); <u>Howell v. Sam's Club #8160/Wal-Mart</u>, 959 F. Supp. 260, 266-67 (E.D. Pa. 1997) (granting summary judgment because, <u>inter alia</u>, "Howell has not presented any evidence detailing the class of jobs from which he is foreclosed . . . ."), <u>aff'd</u>, 141 F.3d 1153 (3d Cir. 1998).

[32] 29 C.F.R. § 1630.2(k).

[33] <u>Tice</u>, 247 F.3d at 513.

[34] <u>See, e.g.</u>, <u>Williams v. Phila. Hous. Auth.</u>, 230 F. Supp. 2d 631, 647 n.16 (E.D. Pa. 2002) (concluding that plaintiff does not have a "record of disability" where plaintiff had a history of a mental impairment but produced no evidence that such impairment substantially limited any major life activity), <u>reconsideration denied</u>, 2002 WL 31859439 (E.D. Pa. Dec. 18, 2002); <u>Taylor v. Phoenixville Sch. Dist.</u>, 113 F. Supp. 2d 770, 774 (E.D. Pa. 2000) (finding no record of impairment because "[t]o the extent a record of impairment exists at all, nothing in that record suggests that the impairment substantially limited a major life activity").

## C.     Plaintiff Was Not "Regarded as" Disabled

Under 42 U.S.C. § 12102(2)(C), individuals who are "regarded as" having a substantially limiting impairment are disabled within the meaning of the ADA. This provision must be read in conjunction with § 12102(2)(A), such that having a disability includes being regarded as having an impairment that substantially limits one or more of the plaintiff's major life activities.[35] Plaintiff can establish she was regarded as disabled if: (1) SEPTA mistakenly believed that Plaintiff has a physical impairment that substantially limits Plaintiff in performing one or more major life activities; or (2) SEPTA mistakenly believed that an actual, nonlimiting impairment substantially limits Plaintiff from performing one or more major life activities.[36]

It is apparent from her memoranda that Plaintiff misunderstands how to advance this type of claim, which requires a showing that SEPTA entertained some "misperception" about Plaintiff: "it must believe either that [Plaintiff] has a substantially limiting impairment that [Plaintiff] does not have or that [Plaintiff] has a substantially limiting impairment when, in fact, the impairment is not so limiting."[37] Plaintiff, however, complains that SEPTA discriminated against her because of her *real* impairments and not on the basis of any imagined impairments or imagined limitations flowing from her real impairments. In a "regarded as" claim, the plaintiff's actual abilities are irrelevant; what matters is how the employer perceived the plaintiff's abilities.

___

[35] See Sutton, 527 U.S. at 489; Rinehimer, 292 F.3d at 381 (employer must regard the employee "to be suffering an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled") (quoting district court slip opinion).

[36] See Sutton, 527 U.S. at 489; 29 C.F.R. § 1630.2(*l*). The regulations would also permit Plaintiff to establish that she was regarded as disabled by showing that her impairments were only substantially limiting because of the attitudes of others toward her impairments. See id. § 1630.2(*l*)(2). There is nothing in Plaintiff's memoranda or the record suggesting she is trying to or could pursue this theory.

[37] Sutton, 527 U.S. at 489.

Plaintiff's memoranda note that SEPTA was aware of her impairments, but she does not present evidence of how SEPTA perceived these impairments as impacting Plaintiff's vocational abilities. This is the crux of a "regarded as" claim.

It is also apparent that Plaintiff misunderstands that advancing a "regarded as" claim is in some ways inconsistent with her assiduously-pressed position that she is actually disabled within the meaning of the ADA.[38]  While the Court is mindful of its duty to be solicitous toward pro se litigants, this duty does not extend to hatching legal arguments on Plaintiff's behalf.  In any event, the Court endeavors to restate Plaintiff's arguments in the context of a "regarded as" claim.

It appears that Plaintiff claims she was "regarded as" disabled because SEPTA:  (1) placed her in the Alternative Duty Program; (2) medically disqualified her from the cashier and mechanic positions; and (3) instructed her coworkers not to smoke cigarettes in the VRC booth.[39] These circumstances all relate to SEPTA's perception of Plaintiff's ability to work, but they do not establish that SEPTA regarded Plaintiff as disabled within the meaning of the ADA.

Standing alone, SEPTA's awareness of Plaintiff's back injury, asthma and/or migraine headaches is insufficient to establish that she was regarded as disabled.[40]  Nor is it sufficient if SEPTA knew about Plaintiff's impairments and granted her some extra consideration

---

[38] Third Circuit precedent permits pursuit of these inconsistent theories for several reasons, one of which is that they are not always inconsistent.  See Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 189 (3d Cir. 1999) (noting it is permissible for a plaintiff to simultaneously argue he is disabled and that he was wrongly regarded as disabled).

[39] See, e.g., Pl.'s Resp. at 9, 21.

[40] Kelly, 94 F.3d at 109 ("[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled. . . ."); Gallagher v. Sunrise Assisted Living of Haverford, 268 F. Supp. 2d 436, 441 (E.D. Pa. 2003).

(such as by instructing coworkers not to smoke in the workplace),[41] reassigned her to different work duties or placed her in a light-duty program,[42] or disqualified her from a particular position because of her limitations.[43] Such evidence does not establish that SEPTA perceived Plaintiff's impairments as substantially limiting her ability to work. Glaringly absent is any evidence that SEPTA perceived Plaintiff as unable to perform a class of jobs or a broad range of jobs.[44] It cannot be said that SEPTA regarded her as disabled unless there is some evidence that SEPTA considered the severity and extent of Plaintiff's impairments and concluded that Plaintiff is disabled within the meaning of the ADA. This might include evidence, for example, that SEPTA perceived Plaintiff's impairments as "too severe to accommodate" because she could not perform most jobs at SEPTA.[45] A "regarded as" claim requires evidence of what the employer believes the plaintiff can or cannot do in light of her perceived impairments. There is no such evidence before the Court, so Plaintiff's "regarded as" claim fails.

---

[41] See Gallagher, 268 F. Supp. 2d at 441 (finding plaintiff was not regarded as disabled where employer made efforts to minimize plaintiff's allergies by keeping pets away from plaintiff's desk and keeping plaintiff's work area vacuumed and free of pet hair); cf. Taylor, 177 F.3d at 190 ("An employer may decide to accommodate people who are not 'disabled' under the ADA.").

[42] See Rinehimer, 292 F.3d at 382 ("The awareness that an employee is sick combined with some change in his work assignments is not enough to satisfy the 'regarded as' prong of the ADA."); Little, 2003 WL 1793528, at *3 (concluding that SEPTA did not regard the plaintiff as disabled merely because it transferred her to a different department after she sustained a back injury).

[43] See Sutton, 527 U.S. at 493 ("Because the position of global airline pilot is a single job, this allegation does not support the claim that respondent regards petitioners as having a *substantially limiting* impairment."); Little, 2003 WL 1793528, at *3 (disqualification from bus driver position does not support allegation that SEPTA regarded plaintiff as having a substantially limiting impairment); Cade, 2002 WL 922150, at *14 ("The fact that Conrail might have regarded plaintiff unable to work in a single job - - as a block operator - - is not evidence that Conrail regarded plaintiff as substantially limited in the major life activity of working.").

[44] Tice, 247 F.3d at 514 ("[I]f the individual is attempting to establish that the employer believed the individual to be limited in the life activity of 'working,' then 'working' must encompass a broad class of jobs.") (citing Sutton, 527 U.S. at 489-93).

[45] Taylor, 177 F.3d at 189.

* * * * *

Based on the foregoing, Plaintiff cannot establish that she is a qualified individual with a disability under the ADA or the PHRA, so she cannot successfully claim that SEPTA discriminated against her because of a disability. Accordingly, summary judgment in favor of SEPTA is appropriate on Plaintiff's disability discrimination claims.

## III.    PLAINTIFF'S RETALIATION CLAIMS

It is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA or PHRA.[46] To establish a <u>prima facie</u> case of retaliation, Plaintiff must show: (1) she engaged in ADA-protected activity; (2) adverse employment action by SEPTA either after or contemporaneous with Plaintiff's protected activity; and (3) a causal connection between Plaintiff's protected activity and SEPTA's adverse action.[47] SEPTA contends that Plaintiff cannot meet any of these elements.

### A.    Plaintiff Engaged in Protected Activity

In general, protected activity includes (a) opposition to a practice made unlawful under the ADA or (b) participation in an ADA investigation, proceeding or hearing by making a charge, testifying or otherwise assisting.[48] SEPTA concedes[49] that Plaintiff engaged in protected activities by:

---

[46] <u>See</u> 42 U.S.C. § 12203(a); 43 Pa. Stat. Ann. § 955(d). Because the anti-retaliation provisions of the ADA and PHRA are substantially similar, the analytical framework is identical. <u>See, e.g.</u>, <u>Fogleman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 657 (3d Cir. 2002).

[47] <u>See, e.g.</u>, <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 187 (3d Cir. 2003).

[48] <u>See, e.g.</u>, <u>Clarkson v. Pa. State Police</u>, No. Civ.A.99-783, 2000 WL 1513773, at *5 (E.D. Pa. Oct. 10, 2000).

[49] Def.'s Resp. at 32-33 n.11.

-21-

(1) filing the 1994 complaint with SEPTA's EEO/AA office regarding sexual harassment at the Callowhill Depot ("1994 Complaint");

(2) filing the May 2000 complaint with SEPTA's EEO/AA office regarding cigarette smoke in the cashier booth ("May 2000 Complaint");

(3) making oral complaints to SEPTA's EEO/AA office in September or October 2000 regarding: (a) SEPTA's denial of her requests for accommodation (specifically pertaining to use of a chair outside the blockers booth, use of a reaching device, and exemption from the steel-tipped boot requirement), and (b) retaliation for seeking such accommodations ("September 2000 Complaint"); and

(4) filing her January 2001 complaint of discrimination with SEPTA's EEO/AA office ("January 2001 Complaint").

Plaintiff also engaged in protected activity when she requested (a) working accommodations from her supervisors at Comly and (b) a location accommodation with respect to her transfer to the Frontier District. SEPTA argues that mere requests for accommodation are not protected activity, but binding and persuasive precedent clearly hold to the contrary.[50] Plaintiff's three requests for working accommodations for her VRC position are part and parcel of the September 2000 Complaint, so those requests are comfortably within the zone of protected activity. Furthermore, Plaintiff engaged in protected activity when, after learning she would be transferred to the Frontier District, she requested a location accommodation from Mr. Duckett, Dr. Press and Mr. Jamison because the lengthy, bumpy commute via public transportation would be too difficult

---

[50] See Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) ("We now hold that requesting an accommodation is protected activity for the purposes of § 12203(a)."); Shellenberger, 318 F.3d at 191 ("The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC.").

given her physical limitations. To mitigate the physical impact of her commute, she requested a transfer to a location closer to her home. This kind of accommodation is clearly contemplated by the ADA.[51] The Third Circuit has instructed that whether an action is protected activity depends on the content of the message that the employee conveys.[52] Here, the message Plaintiff conveyed was that she opposed the transfer, at least in part, because she believed it was effected in retaliation for her previous requests for accommodations. Plaintiff claims she made this request in good faith, and there is no evidence to the contrary.[53] Accordingly, Plaintiff's request for a so-called "location accommodation" was protected activity under the ADA.[54]

### B. Adverse Employment Action

Next, Plaintiff must present evidence of adverse action by SEPTA either after or contemporaneous with her protected activity. Here, again, SEPTA appears to concede that it took adverse action, choosing instead to focus its arguments on the third element of the prima facie case, causation. For purposes of analysis, however, the Court must identify SEPTA's adverse employment actions.

---

[51] See Williams v. United Ins. Co. of Am., 253 F.3d 280, 282 (7th Cir. 2001) (Posner, J.) ("[O]ne form of accommodation that may be required under [the ADA] is reassignment to another job, . . . for example a job closer to the employee's home if she has difficulty getting to work.") (internal citations omitted); see also 42 U.S.C. § 12111(9)(B) (reasonable accommodations may include "reassignment to a vacant position . . . and other similar accommodations").

[52] See Barber v. CSX Distr. Servs., 68 F.3d 694, 702 (3d Cir. 1995) ("Our analysis requires only that we analyze the message that Barber conveyed, and not the medium of conveyance.").

[53] See Shellenberger, 318 F.3d at 191 ("The requirement of a good faith request for an accommodation means that the protection from retaliation afforded under the ADA does not extend to an employee whose request is motivated by something other than a good faith belief that he/she needs an accommodation.").

[54] Plaintiff contacted SEPTA's EEO/AA office on November 24, 2000 and complained about the transfer, but this was not protected activity. Plaintiff testified very explicitly that this call "wasn't a formal complaint. Alls [sic] I wanted to do was work. I just called her up and said, this is what they're doing. Can't you fix this or help me?" Merit Dep. at 200:21-24.

An adverse employment action is one which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."[55] "[M]inor or trivial actions that merely make an employee 'unhappy' are not sufficient to qualify as retaliation under the ADA, for otherwise every action that an 'irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"[56] The Court must utilize an objective standard to determine whether SEPTA's actions meet this test, so Plaintiff's subjective reaction to SEPTA's action is irrelevant.[57]

Viewed in the light most favorable to Plaintiff, the transfer to the Frontier District constitutes adverse employment action. The Third Circuit has held that "a transfer to a job that an employer knows an employee cannot do," or a change in work schedule that materially alters the terms, conditions or privileges of employment, may constitute adverse employment action.[58] It is undisputed that Plaintiff informed SEPTA management that she could not physically tolerate the commute to the Frontier District, and that the commute would add six to eight hours to her workday. There is evidence in the record to the contrary, including Plaintiff's failure to present SEPTA with a doctor's note supporting her claim, but this merely presents a disputed issue of fact. Accordingly, taking the evidence in the light most favorable to Plaintiff, the transfer to the Frontier District was adverse employment action.

---

[55] Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (quoting Robinson, 120 F.3d at 1300).

[56] Mondzelewski, 162 F.3d at 787 (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)).

[57] See id. at 787 n.5 (objective standard applies).

[58] DiIenno v. Goodwill Indus. of Mid-Eastern Pa., 162 F.3d 235, 236 (3d Cir. 1998); Mondzelewski, 162 F.3d at 788 ("Assigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions.").

In addition to the transfer, terminating Plaintiff's employment (and a fortiori denying her a promotion to the position of SEPTA maintenance manager) constitutes an adverse employment action.[59]  This is evident from the text of the ADA itself.[60]

### C.    Causal Connection

Finally, the Court must address whether a causal connection exists between Plaintiff's protected activities and SEPTA's adverse actions.  "The element of causation, which necessarily involves an inquiry into the motives of the employer, is highly context-specific."[61]  It is patently obvious that Plaintiff's January 2001 Complaint did not motivate SEPTA either to transfer or discharge her because those actions ***preceded*** the January 2001 Complaint by almost two months.  Additionally, Plaintiff fails to explain how the 1994 Complaint played any role at all in the events of Fall 2000; indeed, there is no evidence that any relevant SEPTA employees even knew about the 1994 Complaint, so there can be no inference that it motivated discriminatory conduct.  Accordingly, the critical question before the Court boils down to this:  whether Plaintiff has presented sufficient evidence to support the inference of a causal connection between her protected activities - - the May 2000 Complaint, the September 2000 Complaint (and related requests for accommodation), and the November "location accommodation" - - and her subsequent transfer and/or discharge.

A plaintiff can demonstrate a causal connection by showing temporal proximity

---

[59] It is also possible for Plaintiff to establish the "adverse employment action" prong of the prima facie case by showing she was constructively discharged, which requires a showing that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.  See Connors v. Chrysler Fin. Corp., 160 F.3d 971, 973-74 (3d Cir. 1998).  Although Plaintiff complains vociferously about her treatment by SEPTA employees, the Court does not discern a complaint of constructive discharge in her pleadings, nor does SEPTA raise the issue.

[60] See 42 U.S.C. § 12112(a) (prohibiting discrimination on basis of disability in regard to "advancement" and "discharge").

[61] Kachmar v. Sungard Data Sys., 109 F.3d 173, 178 (3d Cir. 1997).

between the protected activity and the adverse employment action; however, the timing of the allegedly retaliatory action must be "very close" or "unusually suggestive" of retaliatory motive before a causal link will be inferred.[62]   Conversely, the "mere passage of time is not legally conclusive proof against retaliation."[63]   In addition to temporal proximity, a plaintiff may present "other types of circumstantial evidence," such as evidence of a "pattern of antagonism" occurring between the protected activity and the adverse action to support the inference of a causal relationship.[64]   There are no hard and fast rules governing the minimum showing required to establish an inference of causation; rather, the focus is on the totality of the circumstances.[65]

Even taking the evidence in the light most favorable to Plaintiff, a reasonable jury could not infer that SEPTA transferred Plaintiff in retaliation for taking any protected activity.  To start with, the temporal proximity between Plaintiff's protected activities and the November 19, 2000 decision to transfer is not particularly close.  Plaintiff filed the May 2000 Complaint approximately six months before the decision to transfer.   Plaintiff requested and SEPTA denied accommodations for performing her VRC duties in September or October 2000, and Plaintiff made her oral complaint to SEPTA's EEO/AA office during this same period.  Accordingly, a period of at least several weeks lies between her September 2000 Complaint and the late-November 2000 decision to transfer.  Standing alone, this timing is not unusually suggestive of retaliatory motives.

---

[62] Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001); Shellenberger, 318 F.3d at 189 n.9 (citation omitted).

[63] Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 894 (3d Cir. 1993).

[64] Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997).

[65] See Farrell, 206 F.3d at 280-81.

Nor does Plaintiff present other circumstantial evidence giving rise to an inference of causation between her protected activities and the transfer. For example, it appears that the relevant SEPTA decisionmakers were unaware that Plaintiff had engaged in protected activity. SEPTA identifies Mr. Duckett as the individual who decided to effect the transfer, but the record belies this assertion. Mr. Duckett testified at the arbitration hearing that he learned about the transfer from Mr. Jamison.[66] For her part, Plaintiff does not identify any individual as being responsible for her transfer. Such ambiguity in the record makes it difficult for the Court to scrutinize SEPTA's motivations in transferring Plaintiff, and by failing to present a triable issue of fact in this regard, Plaintiff fails to sustain her burden in opposing SEPTA's Motion for Summary Judgment. At all events, regardless of whether the subject of inquiry is Mr. Jamison or Mr. Duckett's motivations, there is no evidence from which to conclude that SEPTA retaliated against Plaintiff by transferring her to the Frontier District.

Plaintiff testified that she told her supervisor at the cashier booth about the May 2000 Complaint, but there is no evidence either Mr. Jamison or Mr. Duckett was aware of it. Mr. Duckett testified that he knew Plaintiff had complained that her work was interfering with her health, but there is no evidence that Mr. Duckett knew that Plaintiff had contacted SEPTA's EEO/AA office to complain in September 2000 that she was subject to illegal discrimination.[67] Plaintiff testified that she relayed the substance of her September 2000 Complaint only to Mr. Cook (Mr. Duckett's

---

[66] See Def.'s Ex. 13, 5/29/01 N.T. at 47:11-16.

[67] See, e.g., Def.'s Ex. 13, 5/29/01 N.T. at 47-48 (Duckett testimony recalling Plaintiff's claim that "[t]he vessels in her brain were going to burst from the [bus] fumes," prompting Duckett to send her to SEPTA's Medical Department). Cf. Barber, 68 F.3d at 702 (concluding that a "general complaint of unfair treatment," which "does not explicitly or implicitly allege that age was the reason for the alleged unfairness," is not evidence of protected activity).

predecessor), Ms. Johnson, and two other individuals.[68] In short, there is no evidence that either Mr. Duckett or Mr. Jamison knew that Plaintiff had engaged in protected activity prior to SEPTA's decision to transfer her to the Frontier District.

Furthermore, Plaintiff requested the location accommodation only after she learned about the transfer, so this protected activity could not have motivated the decision to transfer. Nor was SEPTA required to suspend its plans to transfer Plaintiff merely because it learned before the transfer was finalized that Plaintiff was protesting the transfer as retaliatory.[69] Rather, it was required to begin the interactive process by evaluating Plaintiff's impairments.[70] According to the evidence, this is exactly what Mr. Duckett did when, in response to Plaintiff's protest, he directed her to report to SEPTA's Medical Department for a physical evaluation.

SEPTA, on the other hand, offers evidence tending to show that the transfer was not motivated by discriminatory animus. Mr. Duckett testified that SEPTA transferred its employees based on seniority, with the two least-senior employees at Comly going to the Frontier District, which turned out to be Plaintiff and another VRC, Madelaine Caldwell.[71] Plaintiff's job duties at the Frontier District were to remain the same. The collective bargaining agreement and the VRC job description both authorize and contemplate such temporary transfers in certain circumstances. Based on the foregoing, no reasonable jury could conclude that SEPTA, via either Mr. Jamison or

---

[68] See Merit Dep. at 136-38.

[69] See Breeden, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality.").

[70] See Taylor, 177 F.3d at 192 (ADA "requires an interactive relationship between employer and employee, and concomitantly requires an individualized evaluation of employees' impairments").

[71] See Def.'s Ex. 13, 5/29/01 N.T. at 51-52.

Mr. Duckett, transferred Plaintiff in retaliation for engaging in protected activity.

Lastly, the Court must address the possible causal connection between Plaintiff's November 27, 2000 discharge and her preceding request for a location accommodation, made on November 19-21, 2000. Here, the protected activity and the adverse action are separated by only six or eight days. Yet, taken in context, this proximity alone is insufficient evidence upon which to withstand SEPTA's Motion.

Mr. Bethel, the Director of Maintenance at the Frontier District, sent Plaintiff the November 27, 2000 termination letter, so it appears he was the relevant decisionmaker. Yet, there is no evidence that Mr. Bethel was aware that Plaintiff had engaged in any protected activity. It is undisputed that Plaintiff did not know Mr. Bethel. Mr. Bethel knew from his conversation with Mr. Jamison that Plaintiff was planning to call out sick; however, there is nothing in the record to suggest that Mr. Jamison told Mr. Bethel about Plaintiff's request for accommodation. Based on the circumstances, a reasonable person might assume that he did, but the Court cannot deny a motion for summary judgment on the grounds of speculation. Rather, it is Plaintiff's burden to identify some evidence that Mr. Bethel was aware of Plaintiff's protected activity. Such evidence is lacking.

The record shows at best that Mr. Bethel knew Plaintiff intended to call out sick and, given that Dr. Press had cleared Plaintiff to return to work only two days before, Mr. Jamison suggested that Mr. Bethel deny her sick leave and require that she report to SEPTA's Medical Department. At the same time, Mr. Bethel knew that Plaintiff had been performing her duties as a VRC.[72] Based on this evidence, it appears Mr. Bethel adopted reasonable measures to prevent abuse of sick leave at a time when he had good reason to believe Plaintiff was *not* sick. Finally, Plaintiff

---

[72] See Memorandum from Bethel to Curley of 1/17/01.

was terminated in accordance with the collective bargaining agreement for violating SEPTA work rules. Plaintiff has failed to present any contrary evidence to suggest that Mr. Bethel's decision was instead motivated by discriminatory animus.

There is other circumstantial evidence that might support an inference of a causal connection, such as several instances of coworker antagonism toward Plaintiff. For example, her immediate supervisor, Ms. Johnson, intentionally harassed Plaintiff by smoking in the blockers booth, knowing it would aggravate Plaintiff's asthma and migraine headaches. The note posted inside the blockers booth suggests that Plaintiff's efforts to discourage smoking were dismissed and belittled as pesky meddling. SEPTA supervisors singled her out by (a) requiring her to wear steel-tipped boots, a requirement not imposed on other VRCs, and (b) removing her from double-shifts, thereby doubling her work-load. Yet, the critical inquiry is whether SEPTA took adverse employment action against Plaintiff *because* she had engaged in protected activity, as opposed to any other reasons. Plaintiff has failed to articulate how her coworkers' harassment - - or any other circumstantial evidence of record - - is causally related to SEPTA's decision to transfer her or discharge her. In opposing summary judgment, it is incumbent upon the nonmoving party to "set forth specific facts *showing* that there is a genuine issue for trial."[73] This may be difficult for litigants proceeding <u>pro</u> <u>se</u> on claims involving complicated legal analysis, but it is a minimum requirement nonetheless. Because Plaintiff has failed to make the requisite affirmative showing, she simply cannot meet her burden in opposing SEPTA's Motion.

*      *      *      *      *

For the foregoing reasons, Plaintiff cannot establish a <u>prima</u> <u>facie</u> case of retaliation.

---

[73] Fed. R. Civ. P. 56(e) (emphasis added).

Accordingly, Plaintiff's retaliation claim fails and SEPTA's Motion for Summary Judgment is granted.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOZY J. MERIT,
    **Plaintiff**

      v.                 **CIVIL ACTION**
                               **NO.    02-8629**

SOUTHEASTERN PENNSYLVANIA
TRANSIT AUTHORITY,
    **Defendant**

## ORDER

**AND NOW**, this 30th day of April, 2004, upon consideration of Defendant's Motion for Summary Judgment [Doc. #30], Plaintiff's Response and Addendum [Docs. #34-35], Defendant's Reply [Doc. #31], Plaintiff's Sur-Reply [Doc. # 32], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion is **GRANTED** and **JUDGMENT IS ENTERED** in favor of Defendant Southeastern Pennsylvania Transit Authority and against Plaintiff Jozy J. Merit on Count I and Count II of the Complaint.

It is further **ORDERED** for the reasons set forth in the attached Memorandum Opinion that Plaintiff's Motion for Extension of Time and to Compel Discovery [Doc. # 36] is **DENIED**.

The Clerk of Court shall close this case for statistical purposes.

It is so **ORDERED**.

                         **BY THE COURT:**


                         _____

                         **CYNTHIA M. RUFE, J.**